UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

VLADYMIR MILIEN,

                          Plaintiff,

                                                    **MEMORANDUM & ORDER**
              v.                                    20-CV-480 (MKB)

CITY OF NEW YORK – DEPARTMENT OF
EDUCATION and NYC SCHOOL SUPPORT
SERVICES, INC.,

                          Defendants.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

     Plaintiff Vladymir Milien commenced the above-captioned action on January 28, 2020,

against Defendants City of New York – Department of Education ("DOE") and NYC School

Support Services, Inc. ("NYCSSS"), alleging that (1) NYCSSS (a) discriminated and retaliated

against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII") and (b) denied him rights in violation of the Family and

Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and (2) Defendants collectively (a)

discriminated and retaliated against him on the basis of race in violation of the New York City

Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"); (b) failed to pay him

premium overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 207

("FLSA"), and the New York Labor Law § 190 *et seq.* ("NYLL"); and (c) failed to pay him

wage supplements in violation of the NYLL.[1]  (Compl., Docket Entry No. 1.)

---

     [1]  Defendants argue that Plaintiff's NYLL claims against the DOE should be dismissed
because "the NYLL explicitly excludes government agencies from liability."  (Defs.' Mem. in
Supp. of Defs.' Mot. ("Defs.' Mem.") 24, Docket Entry No. 33.)  Plaintiff concedes that "DOE is

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on all of Plaintiff's claims[2] and Plaintiff cross-moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on his FLSA overtime claim and also seeks a determination that DOE, along with NYCSSS, was a joint employer of Plaintiff as a matter of law.[3]  For the reasons set forth below, the Court denies Plaintiff's cross-motion for summary judgment, grants Defendants' motion for summary judgment with respect to Plaintiff's FLSA, NYLL, and FMLA claims, and denies Defendants' motion with respect to Plaintiff's Title VII and NYCHRL discrimination and retaliation claims.

I.   **Background**

The following facts are undisputed unless otherwise noted.[4]

a.   **The parties**

Plaintiff is an African American man, (Defs.' 56.1 ¶ 11), and a member of the Local 32BJ Service Employees International Union, (*id.* ¶ 31).  Plaintiff worked as a cleaner for the DOE

---

excluded from the NYLL's definition of an 'employer'" and is therefore "excluded from the NYLL."  (Pl.'s Mem. in Supp. of Pl.'s Cross-Mot. ("Pl.'s Mem.") 20, Docket Entry No. 28.)  Accordingly, the Court dismisses Plaintiff's NYLL claims against DOE.

[2]  Plaintiff claims that Defendants did not move for summary judgment on his NYLL unpaid wage supplements claim as to NYCSSS.  (Pl.'s Mem. 1.)  However, Defendants specifically move as to these claims in their memorandum in support of their summary judgment motion.  (*See* Defs.' Mem. 2 ("Plaintiff's NYLL claims . . . fail on the merits as against NYCSSS.").)

[3]  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 31; Defs.' Mem.; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 35; Pl.'s Cross-Mot. for Summ. J., Docket Entry No. 27; Pl.'s Mem.)

[4]  (Defs.' Stmt. of Material Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1"), Docket Entry No. 34; Pl.'s Resp. to Defs.' 56.1 ("Pl.'s 56.1 Resp."), Docket Entry No. 29; Defs.' Stmt. of Material Undisputed Facts in Resp. to Pl.'s 56.1 Resp. ("Defs.' 56.1 Resp."), Docket Entry No. 36.)

from January 7, 2011, until June of 2016.  (*Id.* ¶ 11.)  In 2016, Plaintiff stopped working for DOE and began working as a cleaner for NYCSSS, (*id.* ¶ 15), and was subsequently promoted to the title of handyperson on June 8, 2018, (*id.* ¶ 17).  NYCSSS paid Plaintiff on an hourly basis, (Pl.'s 56.1 Resp. ¶ 184), and Plaintiff concurrently held the titles of handyperson and cleaner while working for NYCSSS, (*id.* ¶ 185).  Plaintiff's handyperson duties involved "keeping tools in check, minor fixtures, changing light bulbs, and assisting cleaners."  (Defs.' 56.1 ¶ 18.)

The DOE is NYCSSS's sole client.  (Pl.'s 56.1 Resp. ¶ 179.)  Defendants contend that "NYCSSS is a contractor retained by DOE," (Defs.' 56.1 ¶ 5), but Plaintiff argues that NYCSSS and DOE operate as joint employers, (Pl.'s 56.1 Resp. ¶ 5).[5]  DOE retained NYCSSS in June of 2016, (Defs.' 56.1 ¶ 6), to "provide[] manpower serving maintenance of DOE schools, including [c]leaners, [h]andypersons, and [f]iremen," (*id.* ¶ 7).  NYCSSS also "provides payroll services and human resource functions."  (Pl.'s 56.1 ¶ 178.)  Handypersons employed by NYCSSS report to custodian engineers, (Defs.' 56.1 ¶ 8), who are employed by DOE, (*id.* ¶ 9).  "Custodian Engineers do not have the authority to terminate the employment of [h]andypersons."  (*Id.* ¶ 10.)  NYCSSS custodial employees' salaries and rates of pay are determined by their union agreement with NYCSSS.  (*Id.* ¶ 30.)

**b.   Plaintiff's employment history**

Plaintiff began his tenure with DOE at PS208, (Defs.' 56.1 ¶ 12), before working at X-338, (*id.* ¶ 14), a school in the Bronx, (Dep. Tr. of Vladymir Milian ("Pl.'s Dep.") 22:10–13, annexed to Decl. of Nicholas Schaefer as Ex. D, Docket Entry No. 32-4).  In 2016, Plaintiff

---

[5]  Stephen Brennan, the Executive Director of NYCSSS, (Dep. Tr. of Stephen Brennan ("Brennan Dep.") 7:25–8:5, annexed to Decl. of Justin S. Clark ("Clark Decl.") as Ex. 8, Docket Entry No. 30-8), testified that NYCSSS is "a contractor to the Department of Education," (Brennan Dep. 21:8–12).

continued to work as a cleaner at X-338 after ending his employment with DOE and beginning

his employment with NYCSSS.  (Defs.' 56.1 ¶ 15.)  In December of 2017, Plaintiff began

working at K-198 as a cleaner.  (*Id.* ¶ 16.)  On June 8, 2018, Plaintiff began working at Q-266 as

a handyperson.  (*Id.* ¶ 17.)  On July 11, 2018, Plaintiff began working as the sole handyman at

Q-129,[6] where "his initial schedule was 9:00 [AM] to 5:00 [PM]."  (*Id.* ¶¶ 19, 22, 23.)  Between

July of 2018 and January of 2020, Plaintiff's fellow NYCSSS employees stationed at Q-129

included fireperson Sahin Keles and cleaners Andrzej Mlodozeniec and Peter D'Amico.  (*Id.* ¶¶

32–33.)

Michael Lettieri, who testified that he is Italian-Irish,[7] (Dep. of Michael Lettieri ("Lettieri

Dep.") 27:5–6, annexed to Decl. of Nicholas Schaefer ("Schaeffer Decl.") as Ex. F, Docket Entry

No. 32-6), was the custodian engineer assigned by DOE to Q-129 during Plaintiff's tenure at the

school, (Defs.' 56.1 ¶ 24).  Custodian engineers are employed by the DOE.  (Brennan Dep.

22:21–23:2.)  Plaintiff testified that during his first day of employment at Q-129, Lettieri asked

Plaintiff "you're Vladymir?" as if "he was expecting a Russian,"[8] (Pl.'s Dep. 95:20–22), and was

upset because his prior handyman, who is a white male, (Pl.'s 56.1 Resp. ¶ 195), had been

replaced by Plaintiff, (*id.* ¶ 192).  Lettieri testified that he did not recall making this comment,

(*id.* ¶ 191), and Defendants argue that the comment "is controverted by evidence in this case,"

---

[6]  Plaintiff notes that "PS-129 is also referred to as Q129."  (Pl.'s 56.1 Resp. ¶ 150.)
"Defendants object to this statement on the ground that it is immaterial."  (Defs.' 56.1 Resp. ¶
150.)

[7]  Defendants argue that Lettieri's ancestry is "immaterial," but "otherwise admit that Mr.
Lettieri testified that he self-identifies as Italian-Irish."  (Defs.' 56.1 Resp. ¶ 151.)

[8]  Plaintiff characterizes this interaction differently in his response to Defendants'
Statement of Undisputed Material Facts.  In his response, Plaintiff states that "Mr. Lettieri said
that he was expecting a Russian."  (Pl.'s 56.1 Resp. ¶ 190.)

(Defs.' 56.1 Resp. ¶ 190).  Defendants also object to Plaintiff's statement concerning the race of

the former handyman, arguing that it "is unsupported by admissible evidence and is immaterial."

(Defs.' 56.1 Resp. ¶ 195.)  In addition, Defendants argue that Plaintiff's characterization of

Lettieri as upset about Plaintiff replacing the former handyman is "unsupported by admissible

evidence, . . . consists of inadmissible hearsay and [i]s entirely self-serving."  (*Id.* ¶ 192.)

        "Lettieri was responsible . . . for the work of the custodial and maintenance staff at Q-129

as far as cleanliness, machinery, outside areas, staff, payroll, ordering supplies, and performing

repairs."  (Defs.' 56.1 ¶ 26.)  "Lettieri had the authority to schedule the shifts for the employees

working under his supervision," (*id.* ¶ 27), but "did not have the authority to hire or terminate

employees," (*id.* ¶ 28).  Lettieri testified at his deposition that he had the authority to direct

custodial employees on how they performed their work and when they did their work.  (Defs.'

56.1 Resp. ¶¶ 171–72.)  Defendants dispute Lettieri's authority over NYCSSS employees' use

of vacation time,[9] but Lettieri testified that he has the authority to approve employees' vacation

time requests, (Lettieri Dep. 97:25–98:3), and since July of 2017 has used an online system to

submit the hours worked for each employee under his supervision, (Lettieri Dep. 19:18–20:16);

Plaintiff argues that Lettieri has the authority to approve vacation time, (Pl.'s 56.1 Resp. ¶ 29

("Lettieri had the authority to approve vacation time for custodial employees and submitted

payroll information for custodial employees to ADP for payroll.")).  Lettieri also testified that he

did not have the authority or ability to change the amount of vacation time accrued by NYCSSS

employees.  (Lettieri Dep. 105:19–23.)

_____

        [9] (*See* Defs.' 56.1 Resp. ¶ 29 ("Lettieri was not in charge of overseeing NYCSSS
employees' use of vacation time or the accrual of vacation time.").)

"On August 30, 2018, Plaintiff's hours were changed" from 9:00 AM to 5:00 PM or 9:00 AM to 4:30 PM to "1:00 [PM] to 9:30 [PM]."  (Defs.' 56.1 ¶ 39.)  The parties dispute the reason for Plaintiff's schedule change.  Defendants contend that "Plaintiff's schedule was changed to provide adequate coverage for Q-129 during a construction project when constructors were in the building."  (*Id.* ¶ 40.)  Plaintiff argues that his schedule change was due to Lettieri's discrimination against him based on race.  (Pl.'s 56.1 Resp. ¶ 40.)  Plaintiff testified that he filed a grievance regarding the change in hours, after which a meeting was held in Stephen Brennan's office with Joe Alisio on September 13, 2018, where Plaintiff "presented everything," including "how [Lettieri] was expecting a Russian, . . . was upset about his guy being bumped," and was "causing a hostile work environment."  (Pl.'s Dep. 102:8–20.)

"On October 31, 2018, [P]laintiff signed a Stipulation of Settlement dated October 29, 2018 memorializing an agreement between himself, 32BJ, and NYCSSS to resolve pending grievance(s)."  (Defs.' 56.1 ¶ 42.).  The October 29, 2018 stipulation stated that Plaintiff:

> hereby waives and releases any claims he may have against the Employer [NYCSSS], up to the date of this Stipulation of Settlement.  Such release and waiver includes any and all claims whether at law or in equity, under city, state, or federal law, any regulation or policy, in any court, administrative agency, or any other forum, which Grievant may currently have, which he had in the past, or may have in the future in connection with his employment with the Employer up to the date of this Stipulation of Settlement. . . .  If any agency or court assumes jurisdiction of any such complaint or charge on behalf of Grievant, Grievant will request the agency or court to withdraw from the matter and have such matter dismissed, with prejudice.

(Oct. 2018 Stip. of Settlement ¶ 1, annexed to Schaeffer Decl. as Ex. M., Docket Entry No. 32-13.)  The stipulation also stated that Plaintiff accepted the agreement "as full and final settlement of any and all claims arising out of any weekend days he did not work at K2018 for park clean-up."  (*Id.* ¶ 2.)

### c.   Plaintiff's disciplinary record

Lettieri testified that authority to discipline employees he supervised was "under [his] discretion." (Lettieri Dep. 18:13–19.)  Brennan testified that, as custodian engineer, Lettieri did not have authority to fire, (Brennan Dep. 27:23–28:3), or suspend handypersons, (Brennan Dep. 29:11–16), but could recommend their termination using a Disciplinary Action Form ("DAF") which is sent to NYCSSS for review, (Brennan Dep. 28:4–22).  Plaintiff argues that Lettieri "issued numerous unwarranted and false disciplinary action forms." (Pl.'s 56.1 Resp. ¶ 44, 217.)  Defendants argue that Plaintiff's claim "is controverted by Lettieri's testimony as well as multiple third-party witness statements and documentary evidence." (Defs.' 56.1 Resp. ¶ 217.)

"On three occasions . . . Lettieri requested [Plaintiff's] termination." (Pl.'s 56.1 Resp. ¶ 219.)  Lettieri testified that Plaintiff "couldn't, wouldn't, didn't complete the job," leading Lettieri to believe that Plaintiff did not "know how to do it possibly" because "most of the time it wasn't completed or done very poorly." (Lettieri Dep. 90:17–21.)  Lettieri also testified that Plaintiff "became a real problem in the school," was "very hard to talk to, very rude most of the time," (Lettieri Dep. 88:3–8), and during separate confrontations with Plaintiff, Plaintiff was "loud and abusive," (Lettieri Dep. 86:21), and "loud" and "aggressive," (Lettieri Dep. 87:18–19).  Plaintiff "denies that he was angry, loud, or insubordinate to Mr. Lettieri." (Pl.'s 56.1 Resp. ¶¶ 45, 56, 61, 64, 69, 70, 71, 72.)  Plaintiff testified about terse interactions between himself and Lettieri, including that Lettieri (1) told him in 2019 that he was "not a real handyman" and that he was going to get Plaintiff demoted, (Pl.'s Dep. 144:10–23; Pl.'s 56.1 Resp. ¶ 229); (2) told him approximately five times that he should quit, (Pl.'s Dep. 149:1–12); and (3) told him that he "needed to find a new school to work at" "[e]very time" they saw each other, (Pl.'s Dep. 112:11–

21).  Defendants dispute each claim and argue that they are controverted by the evidence in this case.  (Defs.' 56.1 Resp. ¶¶ 229–31.)

Lettieri submitted a DAF claiming that Plaintiff did not report to work on April 29, 2019, and did not contact Lettieri in advance of his absence.  (DAF 1, annexed to Schaeffer Decl. as Ex. N, Docket Entry No. 32-14.)  Plaintiff testified that Lettieri lied about Plaintiff not contacting him, and further testified that during a grievance he produced cellphone records disproving Lettieri's claim, resulting in the reversal of the writeup.  (Pl.'s Dep. 123:2–10.)  Plaintiff claims that he "timely texted Mr. Lettieri to let him know he would not be able to make it to work and the discipline related to this DAF was overturned."  (Pl.'s 56.1 Resp. ¶ 47.)  Defendants "deny that the suspension was 'overturned,'" and contend that "[t]he suspension was rescinded pursuant to a Stipulation of Settlement without concession of liability or wrongdoing on the part of any signatories."  (Defs.' 56.1 Resp. ¶ 216.)

On May 1, 2019, Lettieri issued Plaintiff a verbal reprimand and provided Plaintiff with a document explaining the correct procedure for reporting an absence.  (Defs.' 56.1 ¶ 48.)  On August 30, 2019, Lettieri memorialized in his logbook entry a conversation in which he spoke to Plaintiff about Plaintiff's alleged failure to finish assigned work, noting that other custodial staff "picked up his work unfairly."  (*Id.* ¶ 49.)  Lettieri also submitted a DAF claiming that on October 7, 8, 10, 15, and 16 of 2019, Plaintiff refused to clean areas of the school as instructed.[10] (DAF 3–4.)  In a written unsworn statement dated October 17, 2019, Keles claimed to have observed Lettieri ordering Plaintiff to clean the specified areas.  (Defs.' 56.1 ¶ 53; Keles Statement, annexed to Schaeffer Decl. as Ex. Q, Docket Entry No. 32-17.)

---

[10]  Plaintiff testified that Lettieri falsely accused him of failing to clean.  (Pl.'s Dep. 127:11–13.)

In a DAF dated October 30, 2019, Lettieri reported that on October 23, 24, 25, and 28 of 2019, Plaintiff did not perform repair work in an efficient and professional manner.  (DAF 5.) Lettieri also reported that on October 30, 2019, Plaintiff "yelled in a very aggressive, inappropriate and disrespectful manor" in front of custodial and kitchen staff members.  (*Id.* at 6.)  In written unsworn statements, Keles and Mlodozeniec claimed to have witnessed Plaintiff's outburst towards Lettieri.  (Defs.' 56.1 ¶¶ 62–63; Statement of Sahin Keles ("Keles Statement"), annexed to Schaeffer Decl. as Ex. S, Docket Entry No. 32-19; Statement of Andrzej Mlodozeniec, annexed to Schaeffer Decl. as Ex. T, Docket Entry No. 32-20.)  Lettieri recommended that NYCSSS terminate Plaintiff's employment, (Defs.' 56.1 ¶ 67), and stated that Plaintiff was not capable of performing the repair work required of the handyperson role, (*id.* ¶ 68).

In a DAF dated December 2, 2019, Lettieri reported that Plaintiff did not attempt to repair a leak and was argumentative when given the repair assignment.  (DAF 9.)  In a DAF dated December 19, 2019, Lettieri reported that after receiving an assignment on December 18, 2019, Plaintiff did not attempt to start the assignment.[11]  (DAF 10.)  In a DAF dated January 7, 2020, Lettieri reported that on December 24, 26, and 31 of 2019 and on January 2, 2020,[12] Plaintiff took time off during the school's seasonal cleaning period.  (DAF 13–14.)

---

[11]  Lettieri asked Plaintiff to paint the interior of a wardrobe.  (Defs.' 56.1 ¶ 77.)  Plaintiff testified that Lettieri's DAF concerning this assignment is a "false statement."  (Pl.'s Dep. 134:19–21.)  Plaintiff explained that "the closet was loaded with textbooks" which he could not remove from "the closet and leav[e] . . . in the classroom" because students were "coming to school in the next day," so he painted the closet on the following day after Lettieri "had the teacher in the classroom remove all the books."  (Pl.'s Dep. 134:23–135:17.)

[12]  While the DAF refers to January 2, 2019, the parties appear to agree that Lettieri intended to refer to January 2, 2020.  (*See* Defs.' 56.1 ¶ 78; Pl.'s 56.1 Resp. ¶ 78.)

Plaintiff testified that in early 2020, when he was presented with a DAF by Lettieri, Lettieri stated "there you go, get at it, boy."[13]  (Pl.'s Dep. 111:5–13.)  In a DAF dated January 15, 2020, Lettieri reported that Plaintiff and Keles had a verbal altercation on the previous day.[14] (DAF 15.)  Keles claimed that Plaintiff was "verbally abusive" and repeatedly called Keles "lazy ass" after Keles requested that Plaintiff "empty the mop bucket after he uses it."  (Keles Statement.)  In a DAF dated January 27, 2020, Lettieri reported that Plaintiff failed to make a requested repair after receiving additional training.  (DAF 19–20.)

Following Plaintiff's transfer request, (Pl.'s Dep. 179:11–180:17), NYCSSS transferred Plaintiff to PS284 in January of 2020, (Defs.' 56.1 ¶ 86).

### d.   Plaintiff's race discrimination allegations based on overtime assignments

The Collective Bargaining Agreement ("CBA") between NYCSSS and 32BJ states that "[a]ny work performed in excess of eight (8) hours in one day or forty (40) hours in a week, or on a Saturday or Sunday, shall be paid at time and one half the employee's regular rate."  (CBA ¶ 5.7, annexed to Schaeffer Decl. as Ex. H, Docket Entry No. 32-8.)  The CBA also states that "Overtime shall be offered to all employees within the classification in rotation by seniority." (*Id.* ¶ 5.8.)  The "classification" mentioned in paragraph 5.8 of the CBA "refers to title, meaning [c]leaner, [f]ireperson, or [h]andyperson."  (Defs.' 56.1 ¶ 90.)

---

[13]   Defendants dispute this statement and claim that it is controverted by evidence, noting that Lettieri only admitted calling Plaintiff "boy" on a single occasion.  (Defs.' 56.1 Resp. ¶ 196.)  Lettieri testified that he "said, 'Atta boy,' very sarcastically to [Plaintiff]," and further explained that this phrase is "something I use in my vocabulary to my kids or — after they did a nice job, nicely."  (Lettieri Dep. 102:21–103:4.)

[14]   In the DAF, Lettieri claims that on January 16, 2020 Plaintiff denied having a verbal altercation with Keles.  (DAF 16.)  Plaintiff denies having denied the verbal altercation with Keles and claims that he "complained to Mr. Lettieri about Mr. Keles's conduct."  (Pl.'s 56.1 Rep. ¶ 83.)

Plaintiff contends that he was discriminated against on the basis of his race in the assignment of weekend overtime work.  (Pl.'s 56.1 Resp. ¶ 3.)  He contends that "he was denied weekend overtime work at Q129 that was, instead, given to his co-workers of lesser title [and] of European descent when it should have alternated."[15]  (*Id.* ¶ 116.)  Plaintiff claims that when he "asked Mr. Lettieri why he was not included in the overtime rotation, Mr. Lettieri told him that 'this is his school' and if [Plaintiff] did not like his rules, then [Plaintiff] should leave."[16]  (*Id.* ¶ 208.)

"From July 2018 through January 2020, Lettieri would determine the extra hours or overtime work for Q-129."  (*Id.* ¶ 106.)  The parties disagree about the manner in which overtime opportunities are provided to employees.  Defendants claim that "[o]vertime opportunities are assigned to NYCSSS employees based on right of refusal by seniority."  (*Id.* ¶ 91; *see also* Defs.' 56.1 Resp. ¶ 167.)  In contrast, Plaintiff notes that Lettieri stated that weekend overtime hours were assigned on an alternating basis.  (Pl.'s 56.1 ¶ 91.)  Plaintiff argues that "Lettieri did not alternate working weekends between the other custodial staff."  (*Id.* ¶ 109.)  In explaining the assignment of overtime work, Lettieri testified that "the guys work it out," (Lettieri Dep. 54:3–

---

[15]  Lettieri, who described himself as "Italian-Irish," (Lettieri Dep. 27:5–6), testified that (1) Keles is from Turkey and is "light skinned," (Lettieri Dep. 26:10–12, 26:15–17); (2) Mlodozeniec is from Poland and has "light skin," (Lettieri Dep. 26:13–14, 26:18–21); and (3) D'Amico is Italian and has "light skin," (Lettieri Dep. 26:22–27:2).  Plaintiff, citing Lettieri's testimony, restates Lettieri's descriptions in his statement of facts.  (*See* Pl.'s 56.1 Resp. ¶¶ 153, 161, 163.)  Defendants object to (1) Plaintiff's description of Keles "on the grounds that it is immaterial and the evidence cited is inadmissible," (Defs.' 56.1 Resp. ¶ 153); (2) Plaintiff's description of Mlodozeniec "on the grounds [that] the cited materials do not support the factual assert[ion]s in the statement," (*id.* ¶ 161); and (3) Plaintiff's description of D'Amico on the grounds that it is "immaterial and inadmissible hearsay," (*id.* ¶ 163).

[16]  "Defendants object to and dispute this statement, as it relies solely upon [P]laintiff's unsupported and self-serving assertion and is contradicted by evidence in this case."  (Defs.' 56.1 Resp. ¶ 208.)

10), he did not assign particular types of weekend work to specific employees, and "everybody pretty much was on the same page," (Lettieri Dep. 56:23–57:3).

Handypersons and [f]irepersons could perform the overtime work of [c]leaners, (Defs.' 56.1 ¶ 93), and "[a] fireperson could also perform the same overtime tasks available to a [h]andyperson," (*id.* ¶ 94). "Certain repair work could only be performed by the [f]ireperson or the [c]ustodian [e]ngineer," (*id.* ¶ 112), and "[t]he [f]ireperson handled regular flushing of the water system to address lead conditions every Monday or after holidays," (*id.* ¶ 113). Handypersons' overtime opportunities varied depending on school building use. (*Id.* ¶ 92.) "Overtime was typically unavailable during the week, unless there was an unusual circumstance such as construction, contractors present in the building, or an emergency." (*Id.* ¶ 103.) "Typically, the overtime opportunities at Q-129 consisted of painting, burnishing floors, repairs, or cleaning on weekends or holidays." (*Id.* ¶ 102.) Overtime work "also consist[ed] of light repairs such as changing light bulbs or fixing shades," (*id.* ¶ 104), and "[t]he custodial staff would . . . perform tests on equipment, including generators, and fire systems, as well as performing boiler and machinery maintenance," (*id.* ¶ 105).

"Plaintiff worked as a [h]andyperson Monday through Friday and as a [c]leaner on weekends." (*Id.* ¶ 98.) Q-129 "had a park which would be opened on weekends at 8:00 [A.M.] and closed at dusk." (*Id.* ¶ 110.) "[P]laintiff's primary overtime [responsibilities] consisted of opening and closing the park at PS208 on weekends," (*id.* ¶ 99), a task which "he had been performing since 2010 as a [c]leaner, prior to his promotion as [h]andyman," (*id.* ¶ 100).[17]

---

[17]  Defendants claim that Plaintiff declined to work overtime at the park "because he was already performing weekend overtime work closer to his home at PS208." (Defs' 56.1 ¶ 111.) Plaintiff states that he "did not decline overtime assignments from Mr. Lettieri," and explains

Plaintiff performed 171 hours of overtime between January 1, 2018, and June 30, 2019, (*id.* ¶ 125), and 175.5 hours of overtime between July 1, 2019, and April 16, 2020,[18] (*id.* ¶ 126).  In total, Plaintiff worked 30 weekend overtime hours at PS-129 between July 11, 2018, and January 24, 2020.  (Pl.'s 56.1 Resp. ¶ 206.)  Plaintiff worked 53.5 overtime hours at Q129 between July 11, 2018, and January 24, 2020.  (*Id.* ¶ 279.)  Plaintiff claims that the last time Lettieri permitted him to work weekend overtime at Q129 was on February 17, 2019.[19]  (*Id.* ¶ 282.)

Mlodozeniec performed 121 hours of overtime between July 1, 2018, and December 31, 2018, (Defs.' 56.1 ¶ 114); 9 hours of overtime between January 1, 2019, and December 31, 2019,[20] (*id.* ¶ 115); and 9 hours of overtime between January 1, 2020, and January 24, 2020, (*id.* ¶ 116), while working as a cleaner, (*id.* ¶ 117).  "D'Amico's overtime work consisted of cleaning, buffing floors, and locking up the park."  (*Id.* ¶ 118.)  D'Amico performed 76 hours of

---

that "Lettieri offered overtime assignments to [him] that were at the same time as [his] weekend work at PS 208."  (Pl.'s 56.1 Resp. ¶ 111.)

[18]  Plaintiff does not dispute that he performed 171 hours of overtime between January 1, 2018, and June 30, 2019, and 175.5 hours of overtime between July 1, 2019, and April 6, 2020, but "clarifi[es] that this sum takes into account non-weekend overtime hours and overtime hours [he] performed . . . outside of Q129."  (Pl.'s 56.1 Resp. ¶¶ 125, 126.)

[19]  Defendants admit that record evidence indicates that Plaintiff's last weekend overtime shift was on February 17, 2019, but state that "[P]laintiff's citation does not support the claim that this was due to Lettieri denying opportunities to [P]laintiff."  (Defs.' 56.1 Resp. ¶ 282.)

[20]  Plaintiff disputes Defendants' assertion that Mlodozeniec worked nine hours of overtime between January 1, 2019, and December 31, 2019.  (Pl.'s 56.1 Resp. ¶ 115.)  Plaintiff argues that Mlodozeniec worked 211 weekend hours at Q129 during that period.  (*Id.*)  Plaintiff also argues that Mlodozeniec worked 313 weekend overtime hours between July 11, 2018, and January 24, 2020, (*id.* ¶ 204), and at least 333 overtime hours at Q129 during the same period, (*id.* ¶ 281).  Defendants object to these statements as duplicative of their Rule 56.1 Statement, (Defs.' 56.1 Resp. ¶¶ 204, 281), but do not specifically dispute Plaintiff's calculations of Mlodozeniec's overtime hours.  The parties appear to disagree about which shifts qualify as overtime hours.  Brennan testified that "[a]ll work on weekends is overtime."  (Brennan Dep. 45:23–24.)

overtime between July 1, 2018, and December 31, 2018, (*id.* ¶ 119); 192 hours of overtime

between January 1, 2019, and December 31, 2019, (*id.* ¶ 120); and 8 hours of overtime between

January 1, 2020, and January 24, 2020, (*id.* ¶ 121), including 270 overtime hours at Q129,[21]

(Pl.'s 56.1 Resp. ¶ 280).   Keles performed 191 hours of overtime between July 1, 2018, and

December 31, 2018, (Defs.' 56.1 ¶ 122); 493 hours of overtime between January 1, 2019, and

December 31, 2019, (*id.* ¶ 123); and 35 hours of overtime between January 1, 2020, and January

24, 2020, (*id.* ¶ 124).

   "Between July 2018 and January 2020," NYCSSS paid Plaintiff bi-weekly.   (Pl.'s 56.1

Resp. ¶ 242.)   While working as a handyperson at PS 129 in 2018, Plaintiff's regular hourly rate

was $28.17 in 2018, (*id.* ¶ 251), and $28.995 in 2019, (*id.* ¶ 266).   The parties disagree about

Plaintiff's proper weekend hourly rate.   Plaintiff contends that his weekend hourly rate of pay at

PS 208 as a cleaner was $38.625 in 2018, (*id.* ¶ 250), and $39.79 in 2019, (*id.* ¶ 265).

Defendants claim that because Plaintiff had only been employed by NYCSSS for two years as of

December 2018, he was not entitled to a $38.625 overtime rate, (Defs.' 56.1 Resp. ¶ 250), and

was not entitled to a $39.79 hourly overtime rate in January of 2019, (*id.* ¶ 265).   Defendants

contend that in January of 2019 Plaintiff was only entitled to a $33.825 overtime rate as a cleaner

based on his length of employment with NYCSSS.   (*Id.* ¶ 275.)

   e.   **Plaintiff's FMLA allegations**

   Plaintiff testified that in April of 2018 he applied for a leave of absence from work under

the Family Medical Leave Act to "bond with [his] newborn."   (Pl.'s Dep. 54:9–56:11.)   Joseph

Aliso, his "union rep supervisor," (Pl.'s Dep. 48:16), requested that he provide "verification or

---

[21]   "Defendants object to this statement as duplicative of" their Rule 56.1 Statement.
(Defs.' 56.1 Resp. ¶ 280.)

[his] son's Social Security card" to establish "proof of [his] newborn."[22]  (Pl.'s Dep. 59:16–

60:7.)  Plaintiff provided either a Social Security card or his son's birth certificate in July of 2018

"so [Aliso] [could] bring it to NYCSS[S]," (Pl.'s Dep. 60:8–20), but he "didn't hear back from

anybody" for months after submitting the request, (Pl.'s Dep. 69:15–25)."[23]

       The parties agree that Plaintiff submitted a request for FMLA leave dated July 30, 2018.

(Defs.' 56.1 ¶ 145.)  Plaintiff claims that on September 18, 2018, NYCSSS approved his leave

request,[24] (Pl.'s 56.1 Resp. ¶ 236), but "only for October 1, 2018 through October 5, 2018,"[25] (id.

¶ 237).  Plaintiff claims that "NYCSSS failed to timely inform [him] that his eligibility for leave

would expire on October 5, 2018."[26]  (Id. ¶ 238.)

---

[22]  In his statement of facts, Plaintiff states that "NYCSSS requested documentation
verifying information about [his] child" in July of 2018.  (Pl.'s 56.1 Resp. ¶ 233.)  "Defendants
object to this statement as unsupported by the cited evidence, which is [P]laintiff's own self-
serving testimony, and unsupported by any record evidence revealed in discovery."  (Defs.' 56.1
Resp. ¶ 233.)

[23]  Defendants argue that "there is no evidence [P]laintiff submitted any FMLA leave
request at any time," as "Plaintiff's request[] for Paid Family Leave plainly indicates that he
would not be seeking FMLA leave."  (Defs.' 56.1 Resp. ¶ 235.)  Despite this assertion,
Defendants acknowledge in their 56.1 Statement that "Plaintiff submitted what he believes to be
an application to take FMLA leave dated July 30, 2018."  (Defs.' 56.1 ¶ 145.)

[24]  Defendants object to this statement and claim "that the cited materials do not support
the factual statements," as the Paid Family Leave form submitted by Plaintiff indicated that he
"was *not* taking FMLA leave concurrent with the Paid Family Leave request."  (Defs.' 56.1
Resp. ¶ 236.)

[25]  Defendants object to this statement "on the grounds that the cited material is solely
[P]laintiff's deposition testimony which is contradicted by the record evidence."  (Defs.' 56.1
Resp. ¶ 237.)

[26]  Defendants object to this statement and note that "the documentary evidence indicates
[P]laintiff did not request FMLA leave."  (Defs.' 56.1 Resp. ¶ 238.)

### f.   Plaintiff's discrimination complaints

"On April 5, 2019, [P]laintiff filed a complaint of discrimination with the Equal

Employment Opportunity Commission ('EEOC')," (Defs.' 56.1 ¶ 127), "alleg[ing] that he was

being discriminated and retaliated against by NYCSSS because of his national origin and race,

claiming Lettieri treat[ed] him differently from his other[] non-African American employees,"

(*id.* ¶ 128).  "On December 27, 2019, the EEOC issued a Dismissal and Notice of Rights to

[P]laintiff."  (*Id.* ¶ 129.)

On May 3, 2019, and December 4, 2019, Plaintiff filed union grievances alleging racial

discrimination against NYCSSS.  (*Id.* ¶ 130.)  "On February 21, 2019, the National Labor

Relations Board dismissed [P]laintiff's charge that his overtime was taken away in or around

July 2018 and that his work schedule was changed in September 2018, as the evidence revealed

NYCSSS had legitimate, non-retaliatory reasons for making the changes."  (*Id.* ¶ 131.)

### g.   Plaintiff's suspension and subsequent events

"On May 6, 2019, [P]laintiff called the Special Commissioner of Investigation's ('SCI')

office to report Lettieri."  (*Id.* ¶ 136.)  "[P]laintiff accused Lettieri of targeting him in response to

a grievance filed in July [of] 2016," claimed that Lettieri was angry that Plaintiff was not

Russian, that Lettieri had denied him FMLA leave, and that Lettieri took away his vacation time

without an explanation.  (*Id.* ¶ 137.)  Mikail Nahian, Deputy Director of Facilities, Queens

North, was assigned by SCI to investigate Plaintiff's complaints.  (*Id.* ¶ 138.)  In an interview,

Plaintiff informed SCI that he had attempted to use more vacation time than what he had

accrued.  (*Id.* ¶ 140.)  "Nahian concluded [P]laintiff's claim of discrimination could not be

substantiated, in part because [P]laintiff did not have any witnesses, and because Lettieri had no

other complaints against him for discriminatory conduct."  (*Id.* ¶ 141.)

Also on May 6, 2019, NYCSSS suspended Plaintiff for five days following Lettieri's submission of a DAF accusing Plaintiff of failing to appear for work on April 29, 2019. (*Id.* ¶ 132.) "Plaintiff filed a grievance with his union concerning the suspension, which was resolved by a Stipulation of Settlement dated December 20, 2019 [("December 2019 Stipulation")]." (*Id.* ¶ 133.) In the grievance, dated May 7, 2019, Plaintiff complained that he was (1) unjustly suspended for five days; (2) owed two days of vacation; and (3) had his contract violated when he was docked two vacation days. (Union Grievance at 17, attached to Schaefer Decl. as Ex. L, Docket Entry No. 32-12.) "As part of the settlement, Plaintiff was compensated for the days of his suspension, and the parties agreed any disputes arising out of the settlement would be resolved in arbitration." (Defs.' 56.1 ¶ 135.)

On December 10, 2019, Plaintiff lodged a complaint with SCI against Keles, Lettieri, and Mlodozeniec for Mlodozeniec's allegedly unauthorized use of the boiler. (*Id.* ¶ 142.) Deputy Director of Facilities William LeRoy was assigned to investigate Plaintiff's allegations on behalf of SCI. (*Id.* ¶ 143.) Following an interview with Plaintiff, "Leroy determined [that] [P]laintiff's December 10, 2019 complaint was unsustainable." (*Id.* ¶ 144.)

In the December 2019 Stipulation, Plaintiff, 32BJ, and NYCSSS agreed to the following terms:

> 1. [Plaintiff] accepts the terms of this Stipulation of Settlement as full and final settlement of any and all claims arising out of the suspension.
>
> 2. Nothing in this Stipulation of Settlement shall be construed as evidence of an admission or concession of any liability or wrongdoing by any of the undersigned.
>
> 3. The suspension has been rescinded and [Plaintiff] is to be compensated for the period of May 6, 2019 to May 10, 2019 (5 days).
>
> 4. NA.

5.  The Union shall withdraw its grievance in this matter.

6.  The undersigned agree that an arbitrator shall have jurisdiction over this matter in the event disputes arise regarding the interpretation or implementation of this Stipulation of Settlement.

(Stipulation of Settlement, attached to Schaefer Decl. as Ex. HH, Docket Entry No. 32-34.)

## II.  Discussion

### a.  Standards of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021) (same).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (same).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (same).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.*  The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return

18

a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-CV-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)); *see also Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000) (observing the same duty, first citing *Beatie v. City of New York*, 123 F.3d 707, 710–11 (2d Cir. 1997); then citing *Anderson*, 477 U.S. at 252).

In cases that involve claims of discrimination, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)). However, "the salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to . . . other areas of litigation." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). Striking this balance requires that to survive summary judgment "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz*, 258 F.3d at 69 (quoting *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997)). "Because the district court is not to resolve issues of fact on a summary judgment motion, 'its determination of whether the circumstances give rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Abdelal v. Police Comm'r*,

857 F. App'x 30, 31 (2d Cir. 2021) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).

**b.   Joint employer under FLSA, NYLL, and NYCHRL**

Plaintiff argues that the Court should declare as a matter of law that DOE was Plaintiff's joint employer with NYCSSS.  In support, Plaintiff argues that the DOE "exercised some authority concerning the disciplining and termination of [Plaintiff] and other custodial employees," and supervised and controlled Plaintiff's work schedule and conditions of employment.  (Pl.'s Mem. 2–3.)  In addition, Plaintiff argues that his rate of pay was controlled by DOE, which also maintained his employment records.  (*Id.* at 4.)

Defendants argue that Plaintiff "was an NYCSSS employee, not a DOE employee." (Defs.' Mem. 24.)  In support, Defendants contend that "DOE did not have the power to hire or fire [P]laintiff, it was not a party to the CBA between [P]laintiff's union and NYCSSS, and, accordingly, did not have control over [P]laintiff's rates of pay or discipline."  (Defs.' Reply 1.)

The FLSA creates liability for any "employer" who violates its terms.  *See, e.g.*, 29 U.S.C. § 207(a)(1).  Under the FLSA, an "employer" is defined broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  "Because the statute defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer."  *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999).  In making that determination, a court should focus on "whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case."  *Id.* (internal citations omitted).

Because the "economic reality" of a relationship drives the analysis as to whether it constitutes an employer-employee relationship for the purposes of FLSA, the determination must

be made on a case-by-case basis in light of the totality of the circumstances and cannot rest on

"technical concepts." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013).  In determining

whether a defendant is an "employer," as defined in the statute, the Second Circuit has identified

four factors to consider, including, "whether the alleged employer (1) had the power to hire and

fire the employees, (2) supervised and controlled employee work schedules or conditions of

employment, (3) determined the rate and method of payment, and (4) maintained employment

records."[27]  *Id.* at 104–05 (quoting *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132,

142 (2d Cir. 2008)) (internal quotation marks omitted).  These factors do not, however,

"comprise a rigid rule for the identification of [a] FLSA employer," but rather provide a

guideline "to ensure that the economic realities test mandated by the Supreme Court is

sufficiently comprehensive and flexible to give proper effect to the broad language of the

FLSA." *Id.* at 105 (*quoting Barfield*, 537 F.3d at 143) (internal quotation marks omitted).  A

---

[27]  The statutory standard for employer status under NYLL is "nearly identical" to that of
the FLSA.  *Ramos v. Guaba Deli Grocery Corp.*, No. 20-CV-4904, 2021 WL 5563714, at *5
(S.D.N.Y. Nov. 29, 2021) (quoting *Olvera v. Bareburger Grp., LLC*, 73 F. Supp. 3d 201, 206
(S.D.N.Y. 2014)); *Cruz v. Rose Assocs., LLC*, No. 13-CV-0112, 2013 WL 1387018, at *2
(S.D.N.Y. Apr. 5, 2013) (noting that the definitions of "employer" under the NYLL and the
FLSA are "coextensive" (citing *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y.
2010))); NYLL § 190(3) ("'Employer' includes any person, corporation, limited liability
company, or association employing any individual in any occupation, industry, trade, business or
service."); *see also Mahoney v. Amekk Corp.*, No. 14-CV-4131, 2016 WL 6585810, at *9
(E.D.N.Y. Sept. 30, 2016) (collecting cases holding that the FLSA and NYLL are interpreted
consistently with one another on the question of employer status).  In addition, courts
determining whether parties are joint employers for purposes of the NYCHRL consider many
similar factors — including "commonality of hiring, firing, discipline, pay, insurance, records,
and supervision" — with an emphasis on determining whether "there is sufficient evidence that
the defendant had immediate control over the other company's employees."  *Brankov v.
Hazzard*, 36 N.Y.S.3d 133, 134 (App. Div. 2016); *see also Popat v. Levy*, 328 F. Supp. 3d 106,
125 (W.D.N.Y. 2018) (citing *Brankov*, 36 N.Y.S.3d at 134).  Accordingly, the Court collectively
considers Plaintiff's joint employer contentions with respect to his FLSA, NYLL, and NYCHRL
claims.

district court is "free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71–72 (2d Cir. 2003).

A genuine issue of material fact exists as to whether DOE was Plaintiff's joint employer for purposes of the FLSA, NYLL, and NYCHRL. The parties agree that Plaintiff formally ended his employment relationship with DOE after becoming a cleaner for NYCSSS in 2016. (Defs.' 56.1 ¶ 15.) However, the parties dispute the degree to which DOE retained control over Plaintiff's employment. Plaintiff was supervised by Lettieri, (*id.* ¶ 8), who was employed by DOE, (*id.* ¶ 9). Lettieri had the authority to schedule Plaintiff's shifts, (*id.* ¶ 27), but did not have the authority to hire or fire Plaintiff, (*id.* ¶ 28). Lettieri also had the authority to recommend Plaintiff's discipline, (*id.* ¶ 46), but the ultimate decision to suspend Plaintiff came from NYCSSS, (*id.* ¶ 132), not DOE. These facts, which support and weigh against Plaintiff's joint employer contention, do not permit the Court to make a definitive ruling as to the issue. *See Kumar v. N.Y.C. Sch. Const. Auth.*, No. 10-CV-3559, 2011 WL 5929005, at *5 (S.D.N.Y. Nov. 29, 2011) (finding that a genuine issue of material fact existed as to whether the DOE was the joint employer of an engineer). Accordingly, because the Court cannot conclude that DOE and NYCSSS were joint employers, the Court declines to determine whether Defendants would be jointly liable for the violations of law alleged by Plaintiff.

      **c.  Release of claims**

Defendants argue that, by agreeing to the Stipulation of Settlement with NYCSSS, Plaintiff released all claims against NYCSSS which accrued prior to October 29, 2018. (Defs.' Mem. 3.) In particular, Defendants argue that "[P]laintiff's claims predicated on the change of his hours in August and September 2018," the "comment allegedly made by Lettieri in July 2018," and the "denial of overtime opportunities originating prior to October 29, 2018 . . . have

been released by [P]laintiff and must be dismissed." (*Id.* at 4.)  Defendants also argue that "any

of [P]laintiff's claims predicated on his suspension have been released . . . and must be

dismissed" because Plaintiff also agreed to the December 2019 Stipulation of Settlement.  (*Id.*)

Plaintiff agrees that the October 29, 2018 Stipulation of Settlement bars his Title VII,

NYCHRL, FMLA, and NYLL claims against NYCSSS which predate October 29, 2018, but

argues that the stipulation does not bar his claims against the DOE or his "FLSA claims [against

all Defendants] because it was not approved by a District Court or the Department of Labor."

(Pl.'s Mem. 9–10 (first citing *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 200 (2d

Cir. 2015); then citing *Scott v. City of New York*, 592 F. Supp. 2d 386, 399 (S.D.N.Y. 2008)).)

Plaintiff also argues that the December 20, 2019 Stipulation of Settlement does not resolve

"claims of discrimination, retaliation, or unpaid wages," and therefore "does not constitute a

valid waiver and release" because it only "appears to resolve a grievance — not claims of

discrimination, retaliation, or unpaid wages."  (*Id.* at 10.)  Plaintiff argues that should the

December 2019 Stipulation be given any effect, its scope should be limited to claims against

NYCSSS stemming from the May 6, 2019 suspension.

"A settlement agreement is a contract that is interpreted according to general principles of

contract law."  *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (citing *Omega Eng'g, Inc.

v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)); *see also In re Motors Liquidation Co.*, 578 F.

App'x. 43, 44 (2d Cir. 2014) ("It is well established that '[s]ettlement agreements are contracts

and must therefore be construed according to general principles of contract law.'" (alteration in

original) (quoting *Collins v. Harrison–Bode*, 303 F.3d 429, 433 (2d Cir. 2002))).  "[A] valid

release constitutes a complete bar to an action on a claim which is the subject of the release."

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011)

(quoting *Glob. Mins. & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 214 (App. Div. 2006)); *see also Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) ("Under New York law . . . , 'a valid release constitutes a complete bar to an action on a claim which is the subject of the release.'" (quoting *Centro Empresarial Cempresa*, 17 N.Y.3d at 276)). "If the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties." *Centro Empresarial Cempresa*, 17 N.Y.3d at 276 (internal quotation marks omitted) (quoting *Booth v. 3669 Delaware*, 92 N.Y.2d 934, 935 (1998)); *Rudovic v. Rudovic*, 16 N.Y.S.3d 856, 859 (App. Div. 2015) (same); *see also Powell*, 497 F.3d at 128 ("Once entered into, the contract is binding and conclusive." (citing *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir. 1989))). "A release may be invalidated, however, for any of 'the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake.'" *Centro Empresarial Cempresa*, 17 N.Y.3d at 276 (quoting *Mangini v. McClurg*, 24 N.Y.2d 556, 563 (1969)); *Pacheco v. 32-42 55th St. Realty, LLC*, 33 N.Y.S.3d 301, 302 (App. Div. 2016) (quoting *Centro Empresarial Cempresa*, 17 N.Y.3d at 276). In addition, the "settlement of a grievance by a union and the employer is binding upon the individual employee, absent evidence that the union has acted in bad faith in carrying out its duty of full and fair representation." *Suissa v. Am. Exp. Lines, Inc.*, 507 F.2d 1343, 1347 (2d Cir. 1974). "[B]ecause the 'law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing],' a release which purports to excuse a party from responsibility for misconduct is subject to the 'closest of judicial scrutiny.'" *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001) (second and third alterations in original) (quoting *Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry*, 494 N.Y.S.2d 721, 723 (App. Div. 1985)).

i.    **October 29, 2018 Stipulation of Settlement**

Plaintiff brought claims against NYCSSS for (1) race discrimination and retaliation in violation of Title VII, (Compl. ¶¶ 47–57); (2) race discrimination and retaliation in violation of the NYCHRL, (*id.* ¶¶ 58–68); (3) unpaid overtime premium wages in violation of the FLSA, (*id.* ¶¶ 69–73); and unpaid overtime premium wages wage supplements in violation of the NYLL, (*id.* ¶¶ 74–83); and FMLA interference, (*id.* ¶¶ 84–87).  Because there is no dispute among the parties that the October 29, 2018 Stipulation of Settlement bars Plaintiff's Title VII, NYCHRL, NYLL, and FMLA claims against NYCSSS which predate October 29, 2018, the Court grants Defendants' motion for summary judgment with respect to these claims.

However, the Court denies Defendants' summary judgment motion with respect to Plaintiff's pre-October 29, 2018 FLSA claims against NYCSSS.  "[T]he Second Circuit has not yet ruled on whether settlement agreements for FLSA-related claims entered into prior to litigation require district court or Department of Labor approval."  *Lee v. New Kang Suh Inc.*, No. 17-CV-9502, 2019 WL 689085, at *3 (S.D.N.Y. Feb. 15, 2019).  "[A] number of courts have enforced releases of FLSA claims in private settlement agreements entered into prior to litigation," indicating "that a private FLSA settlement can, in certain circumstances, be enforceable."  *Tortomas v. Pall Corp.*, No. 18-CV-5098, 2020 WL 2933669, at *4 (E.D.N.Y. May 31, 2020) (collecting cases).  "[W]hether there is a sufficient basis to justify enforcement of a pre-litigation FLSA release is determined on a case-by-case basis," which:

> emphasize[s] such factors as whether the employee had legal representation, whether the employee was fully apprised of her rights under the FLSA, whether the release agreement resolved a *bona fide* dispute as to the employee's entitlement to wages under the FLSA, whether the employee engaged in negotiations with her employer, whether the employee had time to consider her options, and whether the employee received a substantial monetary benefit in exchange for the release of her claims.

25

*Lee v. New Kang Suh Inc.*, No. 17-CV-9502, 2020 WL 5504309, at *6 (S.D.N.Y. Sept. 11, 2020). In consideration of these factors, the Court does not have before it sufficient information to determine whether the October 29, 2018 Stipulation of Settlement was "the result of a fair bargaining process." *Id.* Accordingly, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's pre-October 29, 2018 FLSA claims on this basis.

### ii. December 2019 Stipulation

The Court grants Defendants' motion for summary judgment with respect to Plaintiff's claims against NYCSSS for his May 6, 2019 suspension, but denies Defendants' motion for summary judgment with respect to Plaintiff's claims against DOE arising from the May 6, 2019 suspension. The December 2019 Stipulation was signed by representatives of the Local 32BJ and NYCSSS, and intended to "resolve the suspension" by serving "as a full and final settlement of any and all claims arising out of the suspension." (Stipulation of Settlement 1.) This language bars Plaintiff's claims against NYCSSS concerning his suspension. *See Puccino v. SNET Info. Servs., Inc.*, No. 09-CV-1551, 2011 WL 4575937, at *3, *8 (D. Conn. Sept. 30, 2011) (finding that a settlement agreement which "fully release[d]" defendant from "any . . . claims which may result from the incident giving rise to the grievances" barred a statutory claim stemming from the same facts which gave rise to plaintiff's grievance). However, DOE was not a party to the December 2019 Stipulation, and therefore Plaintiff's claims against DOE concerning his May 6, 2019 suspension may proceed. *See Vincenzo v. Walkill Cent. Sch. Dist.*, No. 21-CV-0308, 2022 WL 913094, at *11–12 (N.D.N.Y. Mar. 29, 2022) (dismissing plaintiffs' discrimination claims against defendants who were party to a settlement agreement but declining to dismiss discrimination claims against a defendant "who was not a party to the [settlement] negotiations").

26

Accordingly, the Court grants in part and denies in part Defendants' summary judgment motion with respect to this issue. Plaintiff's Title VII and NYCHRL claims against NYCSSS which stem from his May 6, 2019 suspension are barred by the December 2019 Stipulation, but Plaintiff's NYCHRL claim against DOE stemming from this suspension may proceed.

### d. Race discrimination claims

Plaintiff claims that NYCSSS violated Title VII by discriminating against him on the basis of race and retaliating against him.

### i. Title VII claim

Defendants argue that Plaintiff's Title VII race discrimination claim should be dismissed for several reasons. First, they argue that Plaintiff did not suffer an adverse employment action or decision. (Defs.' Mem. 5.) Second, even if Plaintiff was subjected to an adverse employment action, "there is no evidence any such action was taken under circumstances that give rise to an inference of discrimination." (*Id.* at 7.) Defendants contend that "[a]n employee's mere disagreement with a supervisor's negative evaluations does not raise an inference of discriminatory intent." (Defs.' Reply 8.) Third, Defendants argue that they "took each of the alleged actions for legitimate, non-discriminatory reasons." (Defs.' Mem. 9.)

Plaintiff argues first, that Lettieri evidenced his discriminatory intent through racist comments and the favoritism he displayed to Plaintiff's white coworkers "of lesser title than" Plaintiff, when Lettieri assigned those coworkers "substantially more weekend overtime work . . . , and did not assign any weekend overtime work to [Plaintiff], an African-American, for nearly a year." (*Id.* at 12–13.) Second, Plaintiff argues that Defendants' explanations for their actions toward him are pretextual, as Defendants' contention that Plaintiff received the same overtime opportunities as his peers "is flatly false," "Lettieri's claimed reason for the suspension was false

27

(and later overturned) and his alleged performance problems are irrelevant to his right to overtime opportunities."  (*Id.* at 12–13.)

Claims of employment discrimination under Title VII are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Zheng-Smith v. Nassau Health Care Corp.*, No. 20-3544-CV, 2021 WL 4097316, at *1 (2d Cir. Sept. 9, 2021) (applying *McDonnell Douglas* framework to Title VII employment discrimination claim), *cert. denied*, 142 S. Ct. 1675 (2022).  To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) "[he] is a member of a protected class; (2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Zheng-Smith*, 2021 WL 4097316, at *1 (internal quotation marks omitted) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015)); *see also Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013).  A plaintiff's burden is "minimal."  *Holcomb*, 521 F.3d at 139; *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019) ("[A] plaintiff's burden to establish an initial prima facie case is, by design, 'minimal and de minimis.'" (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005))).  If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Kelleher*, 939 F.3d at 468.  If the defendant offers a legitimate, nondiscriminatory explanation for its action, the court may nevertheless deny summary judgment if the plaintiff presents sufficient evidence that the explanation was pretext. *See Williams v. Mount Sinai Med. Ctr.*, 859 F. Supp. 2d 625, 637–39, 642 (S.D.N.Y. 2012) (denying summary judgment based on Title VII plaintiff's evidence that employer's nondiscriminatory reasons for termination were pretextual).

To defeat summary judgment in a Title VII discrimination claim, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *see also Montgomery v. N.Y.C. Transit Auth.*, 806 F. App'x 27, 30–31 (2d Cir. 2020) ("To defeat summary judgment in an employment discrimination case under Title VII, . . . the plaintiff's 'admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'" (quoting *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014))); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

The parties do not dispute that Plaintiff was in a protected class and was qualified for the position. The parties dispute whether Plaintiff suffered an adverse employment action that gives rise to an inference of race discrimination.

### 1. Adverse employment action

Defendants contend that the excessive criticism from Lettieri does not qualify as an adverse employment action because it was not accompanied by a change in Plaintiff's pay or responsibilities. (Defs.' Mem. 8.) In addition, Defendants argue that the change in Plaintiff's 2018 summer schedule is not actionable under Title VII because "a schedule change standing alone does not constitute an adverse employment action," and is also meritless because "[P]laintiff has already released NYCSSS of any claims prior to and including October 29, 2018,

29

covering this change in the hours he was assigned to work.  (*Id.* at 6.)  Defendants also argue that

Plaintiff "waived all claims arising out of his May 2019 suspension," (Defs.' Reply 7), and failed

to establish his unfair overtime distribution claim because the record shows that Plaintiff

received similar overtime pay as his colleagues, (Defs.' Mem. 6–7).

      Plaintiff argues that he suffered adverse employment actions in the form of his May 2019

suspension, "unwarranted disciplinary write-ups, threats of demotion and termination, and denial

of overtime opportunities" which "his similarly situated co-workers with lesser titles received."

(Pl.'s Mem. 12.)  Plaintiff argues that Lettieri denied him weekend overtime work, "which

resulted in a decrease in income."  (*Id.*)

      An "adverse employment action" is "a materially adverse change in the terms and

conditions of employment."  *Shultz v. Congregation Shearith Israel of City of New York*, 867

F.3d 298, 304 (2d Cir. 2017) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d

Cir. 2000)); *see also Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 22 (2d Cir. 2015) ("For

purposes of a Title VII discrimination claim by a person already employed,

an adverse employment action is defined in our Circuit as a materially adverse change in the

terms and conditions of employment." (internal quotation marks omitted)).  There is "no bright-

line rule to determine whether a challenged employment action is sufficiently significant to serve

as the basis for a claim of discrimination."  *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235

(2d Cir. 2015) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437, 446 (2d

Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53 (2006)).  "Examples of materially adverse employment actions include termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices

unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)

(alteration, citation, and internal quotation marks omitted); *see, e.g.*, *Robinson v. Dibble*, 613 F.

App'x 9, 12 (2d Cir. 2015) (noting that the plaintiff's termination constituted an "adverse

employment action"); *Levitant v. City of N.Y. Hum. Res. Admin.*, 558 F. App'x 26, 29 (2d Cir.

2014) ("It is well-established that a failure to promote is an adverse employment action."

(citing *Treglia*, 313 F.3d at 720)); *Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d

Cir. 2004) (holding that an adverse employment action includes "termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices unique to a particular

situation." (citations and internal quotation marks omitted)).   "[T]he denial of opportunity to

work overtime or earn greater responsibility may be considered sufficiently adverse to support a

discrimination claim." *Roache v. Long Island R.R.*, 487 F. Supp. 3d 154, 171 (E.D.N.Y. 2020);

*see also Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (noting that plaintiff's allegation

that "she was not allowed to earn overtime pay" satisfied the adverse employment action prong

of a prima facie Title VII case); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217

(E.D.N.Y. 2014) ("A deprivation of the opportunity to earn overtime can be considered a

materially adverse employment action.").   However, conduct that is a "mere inconvenience"

does not rise to the level of an adverse employment action.  *Parsons v. JPMorgan Chase Bank,

N.A.*, No. 16-CV-0408, 2018 WL 4861379, at *7 (E.D.N.Y. Sept. 30, 2018) (quoting *Sanders*,

361 F.3d at 755).

  As explained above, Plaintiff has released his claims against NYCSSS pertaining to his

May 2019 suspension.[28]  Accordingly, the Court does not consider Plaintiff's Title VII claims

stemming from his suspension.

      As for Plaintiff's allegations of "unwarranted disciplinary write-ups" and "threats of

demotion and termination," (Pl.'s Mem. 12), none are sufficient to meet Title VII's adverse

employment action threshold for his discrimination claim.  Plaintiff has not presented evidence

that he was threatened with demotion or termination in a materially adverse manner for purposes

of Title VII.  While Lettieri had the authority to recommend disciplinary action against Plaintiff,

(Defs.' 56.1 ¶ 46), and did so on multiple occasions, (*see, e.g.*, *id.* ¶ 67 (recommending

Plaintiff's termination)), Plaintiff and Defendants agree that Lettieri could not terminate

Plaintiff's employment, (*id.* ¶ 10).  *See Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217,

254 (W.D.N.Y. 2011) ("[T]hreats of termination or other punishment do not qualify as adverse

actions where they were never carried through."); *cf. Tepperwien v. Entergy Nuclear Operations,*

*Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) (determining that threat of termination fell into category

of "trivial harms" and "petty slights or minor annoyances" when the threat was never carried

out); *Herling v. N.Y.C. Dep't of Educ.*, No. 13-CV-5287, 2014 WL 1621966, at \*7 (E.D.N.Y.

Apr. 23, 2014) (holding that write ups were not adverse employment actions because they were

"not accompanied by any negative consequences to the conditions of [Plaintiff's] employment").

      However, Plaintiff's denial of overtime opportunities claim may constitute an adverse

employment action for purposes of Title VII.  Plaintiff contends that he was denied weekend

overtime opportunities that were provided to his coworkers "of European descent."  (Pl.'s 56.1

Resp. ¶ 116.)  Plaintiff last worked a weekend overtime shift at Q129 on February 17, 2019, (*id.*

---

[28]  The Court notes that the threats of discipline prior to Plaintiff's May 2019 suspension
do constitute adverse employment actions but are barred from Title VII consideration pursuant to
the December 2019 Stipulation.

at ¶ 282), and worked 53 overtime hours at PS 129 between July 11, 2018 and January 24, 2020,
(*id.* ¶ 279).  In contrast, during the same period, D'Amico worked 270 overtime hours at Q129,
(*id.* ¶ 280), and Mlodozenic worked 333 hours of overtime at Q129, (*id.* ¶ 281).  Drawing all
reasonable inferences in Plaintiff's favor, Plaintiff has presented sufficient evidence that he was
subject to an adverse employment action by being denied overtime opportunities that were made
available to his coworkers.  *See Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 589
(S.D.N.Y. 2012) (holding that the plaintiff's "allegation that he was denied opportunities for
overtime satisfies the third prong of [plaintiff's] *prima facie* case"); *Little v. Nat'l Broad. Co.*,
210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (denying defendant's motion for summary judgment
on plaintiff's Title VII race discrimination claim where plaintiff "produced evidence that he
incurred an actual loss in income because of lost overtime").

Accordingly, the Court next considers whether the disparity between Plaintiff's overtime
hours and his coworkers' overtime hours gives rise to an inference of race discrimination.

### 2.    Inference of discriminatory intent

Inference of discrimination "is a flexible [standard] that can be satisfied differently in
differing factual scenarios."  *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018)
(quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also*
*Chertkova*, 92 F.3d at 91 ("[T]here is no unbending or rigid rule about what circumstances allow
an inference of discrimination.").  This prong may be "established if the employer fills the
position with 'a person outside the protected class who was similarly or less qualified than' the
plaintiff."  *Yu v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122, 125 n.4 (2d Cir. 2012) (quoting
*Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010)); *see also Benedith v. Malverne
Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 318 (E.D.N.Y. 2014) (finding that the plaintiff

"advance[d] sufficient evidentiary proof to defeat summary judgment as to the prima facie element of an inference of race discrimination" where he showed that he was denied tenure around the same time tenure was awarded to three other administrators outside the plaintiff's protected class). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). An inference of discrimination may also be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20–21 (2d Cir. 2013) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)).

Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has met his burden of establishing an inference of discrimination based on the denial of overtime work opportunities. As discussed above, Plaintiff's overtime hours at Q129 differed markedly during the same period from the overtime hours of his coworkers of different races. In addition, deposition testimony reveals that overtime assignments were awarded in a discretionary manner which a jury could reasonably determine was afflicted by the racial prejudice Plaintiff alleges. The CBA states that overtime opportunities are open "to all employees within the classification in rotation by seniority," (CBA ¶ 5.8), and Defendants similarly assert that "[o]vertime opportunities are assigned to NYCSSS employees based on right of refusal by seniority," (Defs.' 56.1 ¶ 91; *see also* Defs.' 56.1 Resp. ¶ 167). However, Lettieri testified that employees "work it out"

34

themselves, (Lettieri Dep. 54:3–10), and Plaintiff claims that "Lettieri did not alternate working weekends between the other custodial staff," (Pl.'s 56.1 Resp. ¶ 109), and told Plaintiff when confronted about the overtime assignment policy "that 'this is his school' and if [Plaintiff] did not like his rules, then [Plaintiff] should leave," (*id.* ¶ 208). The disparity between Plaintiff's overtime hours and the overtime hours of his coworkers — who, like Plaintiff, were cleaners, (*id.* ¶¶ 32–33, 98) — together with Lettieri's discretion in the assignment of overtime opportunities, when considered in the context of his allegedly racist remark towards Plaintiff, (*see* Pl.'s Dep. 111:5–13 (claiming that Lettieri referred to Plaintiff as "boy")), are sufficient to give rise to an inference of discriminatory intent in the assignment of overtime hours. *See Littlejohn*, 795 F.3d at 312 (noting that an inference of discrimination may "arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms" (internal quotation marks omitted)); *Eka v. Brookdale Hosp. Med. Ctr.*, 247 F. Supp. 3d 250, 267–68 (E.D.N.Y. 2017) (holding that a supervisor's discriminatory "comments, coupled with her handling of [the plaintiff's] shift assignments, are sufficient to create an issue of fact as to whether . . . the limitation on [plaintiff's] overtime opportunities occurred under circumstances giving rise to inference of discrimination"); *Alhaj v. NYC Health & Hosps. Corp.*, 177 N.Y.S.3d 433, 454 (Sup. Ct. 2022) ("[C]ertain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness."); *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 495–96 (E.D.N.Y. 2016) (finding a plausible inference of discrimination where plaintiff was denied overtime and identified coworker "comparators . . . who were accountable to the same supervisors" and "similarly situated, but were subjected to disparate treatment"); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (acknowledging that use of the term "boy," "standing alone" is not always benign, "depend[ing] on various factors including context,

inflection, tone of voice, local custom, and historical usage").

### 3.   Defendant's legitimate, nondiscriminatory reasons

Defendants have proffered legitimate, non-discriminatory reasons for Plaintiff's overtime

assignments.  The record reflects that Plaintiff worked 346.5 overtime hours between January 1,

2018, and April 26, 2020, (Defs.' 56.1 ¶ 125), and Plaintiff has acknowledged that he did not

take all opportunities for overtime assignments at Q129 because "Lettieri offered overtime

assignments to [him] that were at the same time as [his] weekend work at PS 208," (Pl.'s 56.1

Resp. ¶ 111).  Because Defendants have proffered legitimate, nondiscriminatory reasons for

Plaintiff's overtime assignments, the burden shifts to Plaintiff to show that these reasons are a

pretext for discrimination.  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) ("If the

defendant proffers such a reason, the presumption of discrimination . . . drops out of the analysis,

and the defendant will be entitled to summary judgment . . . unless the plaintiff can point to

evidence that reasonably supports a finding of prohibited discrimination." (alterations in original)

(quoting *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216–17 (2d Cir. 2005))).

### 4.   Pretext

Upon the defendant's showing of a legitimate, nondiscriminatory reason for the

employment action, the plaintiff must "produce not simply some evidence, but sufficient

evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered

by the [defendant] were false, and that more likely than not [discrimination] was the real reason

for the [employment action].'"  *DiCesare v. Town of Stonington*, 823 F. App'x 19, 24 (2d Cir.

2020) (alterations in original) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714

(2d Cir. 1996)); *Mullins v. City of New York*, 626 F.3d 47, 53–54 (2d Cir. 2010) (applying the

same framework).  A plaintiff may show pretext "by demonstrating weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action." *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 651 (2d Cir. 2020) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (same).

The Court finds that there are genuine material issues of fact regarding Plaintiff's overtime assignments which preclude summary judgment. While Defendants claim that Plaintiff was assigned overtime work pursuant to the policy outlined in the CBA and at a rate on par with his coworkers, there is conflicting evidence in the record concerning these claims. Lettieri testified both that overtime assignments were made according to seniority — which aligns with the overtime assignment policy outlined in the CBA — and that a more ad hoc system existed allowing employees to "work it out" themselves, (Lettieri Dep. 54:3–10). In light of the conflicting evidence concerning the assignment of overtime opportunities, the gap between Plaintiff's overtime hours and his coworkers' overtime hours — a gap of approximately 217 hours between Plaintiff and D'Amico and 280 hours between Plaintiff and Mlodozeniec, (Pl.'s 56.1 Resp. ¶¶ 279–81) — and Plaintiff's allegations of Lettieri's racial discrimination, a reasonable jury could determine that Plaintiff suffered from impermissible race discrimination in the allocation of overtime work. Accordingly, the Court denies Defendants' summary judgment motion with respect to Plaintiff's Title VII race discrimination claim concerning the assignment of overtime work.

### ii.   NYCHRL claim

Because the Court denies Defendants' summary judgment motion as to Plaintiff's Title VII race discrimination claim, and in view of the fact that the NYCHRL applies a more lenient standard than its federal counterpart, *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157

(2d Cir. 2017), the Court also denies Defendants' motion as to Plaintiff's NYCHRL race discrimination claim. *See Washington v. NYC Madison Ave. Med. P.C.*, No. 20-CV-3446, 2023 WL 4980215, at *7 (S.D.N.Y. Aug. 3, 2023) ("Because Plaintiff meets the prima facie case requirements under Title VII and can establish genuine disputes of material facts that preclude summary judgment, logically, Plaintiff also meets the requirements of NYCHRL provisions that are much more liberally construed.").

### e.   Retaliation claims

#### i.   Title VII claim

Defendants argue that Plaintiff's Title VII retaliation claim fails for several reasons. First, other than the suspension for which he signed a release, Plaintiff did not suffer an adverse employment action in retaliation for any protected activity which he undertook.  (Defs.' Mem. 15.)  Second, even if Plaintiff can establish an adverse action, "there is no evidence of a causal relationship between any of his allegedly protected activities and any adverse employment action." (*Id.* at 16.)  Third, Plaintiff was not disciplined for any protected activity, which Defendants identify as (1) the April 5, 2019 EEOC complaint, (2) the May 6, 2019 call to the DOE's Special Commissioner of Investigation's Office, and (3) the May 3, 2019 and December 4, 2019 union grievances.  (*Id.* at 19.)  Fourth, they "had legitimate, non-retaliatory, grounds for changing [P]laintiff's schedule and submitting DAFs for [P]laintiff's job performance," (*id.* at 18).

Plaintiff argues that, in addition to his May 2019 suspension, he "suffered from adverse employment actions in the form of unwarranted disciplinary write-ups, threats of demotion and termination, and denial of overtime opportunities." (Pl.'s Mem. 17.)  Plaintiff also argues that he has shown temporal proximity between his protected activities and Defendants' adverse

38

employment actions because "Lettieri issued a false disciplinary action form, which resulted in [Plaintiff's] suspension on May 6, 2019, less than one month after [Plaintiff] engaged in a protected activity by filing an EEOC charge on April 5, 2019." (*Id.*)  In addition, Plaintiff argues that "evidence of direct animus towards [him] by Mr. Lettieri" is evidenced by Lettieri's frequent issuance of disciplinary action forms to [him] and by Lettieri's recommendation of [his] firing on three occasions.  (*Id.* at 17–18.)

Title VII prohibits retaliation against an employee who "has opposed any practice [that is] made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a); *Green v. Mount Sinai Health Sys., Inc.*, 826 F. App'x 124, 125 (2d Cir. 2020) ("Title VII prohibits employers from retaliating against any employee because that individual has opposed any practice made unlawful by Title VII." (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015))).  Title VII retaliation claims are evaluated using the three-step framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Carr v. N.Y.C. Transit Auth.,* 76 F.4th 172, 178 (2d Cir. 2023); *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018) (citing *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)).  Under the framework, the plaintiff must first establish "a prima facie case of retaliation."  *Id.* (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Littlejohn*, 795 F.3d at 315–16 (quoting *Hicks*, 593 F.3d at 164).  If the plaintiff sustains this initial "de minimis" burden, *Duplan*, 888 F.3d at 626, a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action," *Saji*, 724 F. App'x at 14 (quoting

*Hicks*, 593 F.3d at 164).  "If the defendant does so, then the burden shifts back to the plaintiff[] .

. . [to] show that the reason offered by the employer is merely pretext, and that the employer's

'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'"  *Id.*

(quoting *Ya-Chen Chen*, 805 F.3d at 70).  "'But-for' causation does not, however, require proof

that retaliation was the only cause of the employer's action, but only that the adverse action

would not have occurred in the absence of the retaliatory motive."  *Duplan*, 888 F.3d at 625

(quoting *Vega*, 801 F.3d at 90–91).

The parties do not dispute that Plaintiff participated in protected activity and that

Defendants were aware of the protected activity, but dispute whether Plaintiff suffered from an

adverse employment action causally connected to his participation in the protected activity.

### 1.   Adverse employment action

Defendants argue that Plaintiff was not subject to any adverse employment action.[29]

(Defs.' Mem. 15.)  Defendants contend that criticisms of Plaintiff's job performance do not

constitute adverse employment actions and "any claim that [Plaintiff] was retaliated against by

unavailability of overtime is not supported by the record evidence as actually having occurred."

(*Id.* at 15–16.)  In addition, Defendants argue that Plaintiff "did not suffer any material loss of

benefits, significantly diminished material responsibilities or change to his title or pay."  (*Id.* at

15–16.)

Plaintiff argues that he "suffered an adverse employment action other than the May 2019

---

[29]  Defendants concede that Plaintiff's suspension constitutes an adverse employment
action but argue that claims arising from his suspension were settled and therefore not
actionable.  (Defs.' Mem. 15.)  As discussed above, Plaintiff's claims against NYCSSS which
stem from his May 6, 2019 suspension are barred by the December 2019 Stipulation.
Accordingly, the Court does not consider Plaintiff's suspension in its Title VII retaliation
analysis.

suspension," including "unwarranted disciplinary write-ups, threats of demotion and termination, and denial of overtime opportunities."  (Pl.'s Mem. 16–17.)

Adverse employment actions are actions that "could well have dissuaded a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination [or conduct prohibited by Title VII]."  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (first quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006); and then citing *Burlington N.*, 548 U.S. at 57); *see also Rivera v. JP Morgan Chase*, 815 F. App'x 603, 608 (2d Cir. 2020) (affirming that an adverse employment action for Title VII retaliation purposes is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination," and that standard "covers a broader range of conduct than the adverse-action standard for claims of discrimination"); *O'Toole v. County of Orange*, 255 F. Supp. 3d 433, 442 (S.D.N.Y. 2017) ("Defendant's conduct, considered as a whole, meets the 'objective' standard, as the 'employment consequences of a negative nature' resulting from making a complaint could chill other employees from speaking up." (quoting *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014))).  "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."  *Hicks*, 593 F.3d at 165 (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

Plaintiff has presented sufficient evidence that he endured actionable adverse employment actions with respect to his Title VII retaliation claim.  The DAFs dated December 19, 2019, and January 7, 2020, recommended Plaintiff's termination, (DAF 12-15), while the January 15, 2020 and January 16, 2020 DAFs recommended counselling or a verbal reprimand,

41

(DAF 17–19), and a DAF dated January 27, 2020, recommend that Plaintiff receive training,

(DAF 20-21).  As such, the DAFs constitute adverse actions for purposes of Plaintiff's Title VII

retaliation claim.[30]  *See Ogula v. City of New York*, No. 20-CV-6346, 2023 WL 5310435, at *10

(E.D.N.Y. Feb. 13, 2023) (holding that a plaintiff who "suffered . . . constructive threats of

termination" was subject to an adverse employment action for purposes of a Title VII retaliation

claim).  As discussed above, Plaintiff has also established that his overtime allegations constitute

an adverse employment action.  Therefore, Plaintiff has established adverse employment actions

with respect to his overtime claims and the DAFs.

## 2.   Causal connection

Defendants argue that "there is no evidence of a causal relationship between any of

[Plaintiff's] allegedly protected activities and any adverse employment action."  (Defs.' Mem.

16.)  Defendants contend that "[P]laintiff cannot point to any specific adverse employment action

which is causally related to his May 6, 2019 complaint to SCI" because he "was not subject to

any disciplinary action until Lettieri filed DAFs against him in the fall of 2019."  (*Id.* at 17.)

Defendants further argue that the disciplinary actions are too attenuated to establish causation, as

"gradual adverse job actions had begun well before . . . [P]laintiff had ever engaged in the

protected activity in question" and the DAFs were "too far removed" from Plaintiff's protected

activity "to allow for an inference of causation."  (*Id.* at 17–18.)

Plaintiff argues that Lettieri's denial of overtime and the DAFs he issued between

---

[30]  Defendants appear to concede that the DAFs constitute adverse actions.  (*See* Defs.'
Mem. 17–18 ("Here, gradual adverse job actions had begun well before . . . [P]laintiff had ever
engaged in the protected activity in question, cutting against an inference of retaliation . . . .  All
DAFs submitted regarding Plaintiff occurred either before any qualifying protected activities,
were resolved by release, or approximately five or more months after Plaintiff's grievance of
May 2019, or at least six months after Plaintiff's EEOC complaint of April 2019.").)

October 2019 and January 2020 "establish . . . adequate temporal proximity to prove a causal connection between [his] May 2019 complaint to SCI and the subsequent adverse actions taken against him by Mr. Lettieri" as well as "evidence of direct animus towards [Plaintiff] by Mr. Lettieri."  (Pl.'s Opp'n 17–18.)

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon*, 232 F.3d at 117); *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (same); *see also Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) ("Proof of such a causal connection 'can be established "directly through evidence of retaliatory animus directed against a plaintiff," or "indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . such as disparate treatment of fellow employees who engaged in similar conduct."'" (quoting *Richardson*, 180 F.3d at 444, *abrogated on other grounds by White*, 548 U.S. at 53)).  A gap of seven months between a protected activity and an alleged retaliatory act can be "sufficient to infer causation."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 128–29 (2d Cir. 2013). "Eleven months is, to say the least, at the very outer limit of the amount of time that is considered sufficient to establish causation," *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009), but a gap of twenty months "suggests, by itself, no causality at all," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).

Plaintiff has sufficiently established causation based on temporal proximity.  Plaintiff filed a union grievance on December 4, 2019, alleging that NYCSSS was impermissibly

discriminating against him on the basis of race.  (Defs.' 56.1 ¶ 130.)  Subsequently, Lettieri filed

multiple DAFs against Plaintiff over the next two months, (DAF 10, 13–15, 19–20), including

DAFs on December 19, 2019, January 7, 2020, January 15, 2020, January 16, 2020, and January

27, 2020, (DAF 12–21).  *See Rivera*, 815 F. App'x at 608 (collecting cases finding close

temporal proximity between protected activity and adverse employment action sufficient to

establish causal connection); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)

(finding gap of five months potentially supportive of prima facie case of retaliation); *Gorman-

Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001)

(finding gap of four months supportive of prima facie case of retaliation); *De Figueroa v. New

York*, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) ("There is no firm outer limit to the temporal

proximity required, but most courts in the Second Circuit have held that a lapse of time beyond

two or three months will break the causal inference."); *see also Espinal v. Goord*, 558 F.3d 119,

129 (2d Cir. 2009) (holding that the court may "exercise its judgment about the permissible

inferences that can be drawn from temporal proximity in the context of particular cases").

These facts support a causal connection between Plaintiff's protected activities and the

adverse employment actions perpetrated by Lettieri, raising an issue of genuine material fact that

must be decided by a jury.

### 3.   Defendant's legitimate, non-retaliatory reasons

Defendants have proffered legitimate, non-discriminatory reasons for Plaintiff's overtime

assignments and the DAFs.  Defendants contend that the DAFs "were tied to specific events and

performance failures on [P]laintiff's part, and [the DAFs] form a pattern of escalating responses

to [P]laintiff's inability and unwillingness to do his job."  (Defs.' Mem. 19.)  In addition,

Defendants argue that "[P]laintiff's overtime discrepancy claim is entirely belied by the actual

documentary evidence and his own testimony." (Defs.' Reply 9.) As explained above, Plaintiff

has acknowledged declining overtime work opportunities offered by Lettieri. (Pl.'s 56.1 Resp. ¶

111.) The record also reflects that Plaintiff's coworkers buttressed Defendants' claims of

Plaintiff's insubordination by attesting to Plaintiff's allegedly lackluster job performance.

(Defs.' 56.1 ¶ 53, 62–63.) Because Defendants have proffered legitimate, nondiscriminatory

reasons for Plaintiff's overtime assignments and the DAFs, the burden shifts to Plaintiff to show

that these reasons are a pretext for retaliation. *See Palencar v. N.Y. Power Auth.*, 834 F. App'x

at 651 ("If the employer articulates [a non-retaliatory reason for the adverse employment action],

'the presumption of retaliation dissipates,' leaving the plaintiff to 'prove that the desire to

retaliate was the but-for cause of the challenged employment action.'" (quoting *Ya-Chen Chen*,

805 F.3d at 70)).

### 4.   Pretext

To survive summary judgment on a claim of retaliation, a plaintiff must show that

retaliatory intent was the "but-for" cause of any wrongful actions — that is, "the unlawful

retaliation would not have occurred in the absence of the alleged wrongful action or actions of

the employer." *Nassar*, 570 U.S. at 360; *see Hua Lin v. N.Y.S. Dep't of Lab.*, 720 F. App'x 89,

90 (2d Cir. 2018) (same); *Russell,* 739 F. App'x at 32 (noting that to be actionable, the retaliation

must have been the "'but-for' cause of the adverse action, and not simply a 'substantial' or

'motivating' factor" (quoting *Zann Kwan*, 737 F.3d at 845)); *Zann Kwan*, 737 F.3d at 850

(Parker, J., concurring) (citing *Nassar*, 570 U.S. at 360) (noting that Title VII retaliation claims

must show "but-for" causation). "Temporal proximity alone is insufficient to defeat summary

judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847; see *Abrams*, 764 F.3d at 254

("[T]emporal proximity alone is not enough to establish pretext in this Circuit." (citing *El Sayed*

*v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010))). "However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at [the pretext] stage." *Zann Kwan*, 737 F.3d at 847 (finding close temporal proximity and inconsistent explanation for termination sufficient to raise a triable issue of fact as to pretext); *see Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 654–56 (S.D.N.Y. 2015) (finding temporal proximity of mere days along with the lack of evidence or indication that the employee was a poor performer sufficient to raise a triable issue of fact as to pretext).

There are genuine questions of material fact as to whether Defendants' proffered explanations for the DAFs and Plaintiff's allotted overtime opportunities were pretextual and whether retaliatory intent was the "but-for" cause of any wrongful action. As discussed above, multiple DAFs were issued close in time to Plaintiff's December 4, 2019 union grievance asserting that Defendants were impermissibly discriminating against him on the basis of race. In addition, Plaintiff did not receive any weekend overtime assignments at Q129 following his April 5, 2019 EEOC complaint. While Defendants contend that Plaintiff was afforded the same overtime as his coworkers and the DAFs were issued due to Plaintiff's poor job performance, a jury could reasonably conclude in light of the evidence before the Court that the DAFs and the small number of weekend overtime opportunities provided to Plaintiff compared to his coworkers were a product of Defendants' retaliation. *See Zann Kwan*, 737 F.3d at 846 (finding that the pretext stage "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive" and that a plaintiff can fulfill this burden by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate,

nonretaliatory reasons for its action").

Accordingly, the Court denies Defendants' summary judgment motion with respect to Plaintiff's Title VII retaliation claim.

### ii.   NYCHRL claim

Because Plaintiff has proffered sufficient evidence to support his Title VII retaliation claim, Plaintiff has also proffered sufficient evidence to support his NYCHRL retaliation claim. *See Carmody v. N.Y. Univ.*, No. 21-CV-8186, 2023 WL 5803432, at *9–10 (S.D.N.Y. Sept. 7, 2023) (finding that "[p]laintiff has offered sufficient evidence to preclude summary judgment on her federal retaliation claim" and denying defendants' motion for summary judgment on plaintiff's NYCHRL retaliation claim because "[t]he evaluation of retaliation claims for summary judgment . . . under the NYCHRL . . . is less demanding of plaintiffs than under Title VII"); *see also Colon v. Mark-Viverito*, No. 16-CV-4540, 2018 WL 1565635, at *6 (E.D.N.Y. Mar. 26, 2018) (denying motion to dismiss NYCHRL retaliation claim on the basis that the court "already found that [p]laintiff satisfies the more stringent standard applied to retaliation claims brought under Title VII "). Accordingly, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's NYCHRL retaliation claim.

### f.   Overtime claims

#### i.   FLSA overtime claim

Plaintiff claims that he is entitled to summary judgment on his FLSA overtime claim because Defendants paid him at an incorrect overtime rate by "incorrectly believ[ing] or falsely claim[ing] that [his] overtime rate depends upon which title he is working under at the time the work is performed." (Pl.'s Mem. 4.) In support, Plaintiff contends that Defendants miscalculated his overtime compensation by not using the weighted average of his cleaner and

handyperson pay rates as his weekly regular rate since he worked at two or more different types of work with different non-overtime rates of pay.  (*Id.* at 4–5.)

Defendants argue that Plaintiff's FLSA overtime claims should be dismissed because Plaintiff's overtime tasks "were all tasks classified as appropriate for a cleaner," meaning that his overtime compensation was appropriately apportioned at the rate of the cleaner position.  (Defs.' Mem. 23.)  Defendants also argue that Plaintiff incorrectly calculated his overtime pay figures by "claim[ing] a higher rate of pay than is permitted under the governing CBA for his level of experience and inappropriately claim[ing] entitlement to the weighted-average calculation for his rate."  (Defs.' Reply 4.)  In addition, Defendants argue that summary judgment should be denied on Plaintiff's FLSA claim because "[D]efendants qualify for the exception set forth under 29 U.S.C. 207(g)(2)" since Plaintiff "was paid time-and-a-half for his overtime hours, and . . . he worked in two different jobs, at two different rates which were clearly defined by the governing CBA."  (*Id.* at 5.)

FLSA "requires employers to pay overtime compensation to covered employees." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1138 (2018).  Those employees must "be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty hours per week."  *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013); *Pinzon v. Paul Lent Mech. Sys., Inc.*, No. 11-CV-3384, 2012 WL 4174725, at *3 (E.D.N.Y. Aug. 21, 2012) (citing *Rodriguez v. Queens Convenience Deli Corp.*, No. 09-CV-1089, 2011 WL 4962397, at *3 (S.D.N.Y. Oct. 18, 2011)), *report and recommendation adopted*, No. 11-CV-3384, 2012 WL 4174410 (E.D.N.Y. Sept. 19, 2012).  "When work in a single workweek is performed at two or more non-overtime rates, 29 U.S.C. § 207(a) requires that overtime ordinarily be compensated at not less than one-and-a-half

times the weighted average of all non-overtime rates applied during that workweek." *Estrella v.*

*P.R. Painting Corp.*, 356 F. App'x 495, 496 (2d Cir. 2009) (citing *Gorman v. Consol. Edison*

*Corp.*, 488 F.3d 586, 596–97 (2d Cir.2007)).  However:

> Section 207(g)(2) provides an exception to the weighted-average method of overtime compensation if (1) a given "employee perform[s] two or more kinds of work for which different hourly . . . rates have been established," (2) overtime compensation is "computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours," and (3) such computation method is applied "pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work."

*Id.* (quoting 29 U.S.C. § 207(g)).

Plaintiff has failed to establish that he was paid the incorrect rate for his overtime work.

Plaintiff's compensation rates, including his overtime pay, was set pursuant to an agreement

between his union and NYCSSS.  (Defs.' 56.1 ¶ 30; *see also* CBA.)  Plaintiff has acknowledged

that his overtime and regular work responsibilities were the same.  (Defs.' 56.1 ¶¶ 99–100.)

Therefore, he was entitled to an overtime rate of "not less than one and one-half times" the rate

of his regular pay.  *Estrella*, 356 F. App'x at 496.  While working as a handyperson at PS 129 in

2018, Plaintiff's regular hourly rate was $28.17 in 2018, (Pl.'s 56.1 Resp ¶ 251), and $28.995 in

2019, (*id.* ¶ 266).  Plaintiff's overtime rate was $42.255 in 2018, (Earnings Statement, annexed

to Clark Decl. as Ex. 19, Docket Entry No. 30-19), and $43.50 in 2019, (Earnings Statement,

annexed to Clark Decl. as Ex. 20, Docket Entry No. 30-20).  Because Plaintiff's overtime rates in

2018 and 2019 were one and one-half times his regular pay rate, his overtime pay was consistent

with FLSA's requirements.  *See Richter v. Vill. of Oak Brooks, Ill.*, No. 03-CV-3793, 2006 WL

1049745, at *6 (N.D. Ill. Apr. 18, 2006) (holding that plaintiff's compensation at rates not less

than one and one-half times such rates applicable to the same work when performed during non-

overtime hours was consistent with § 207(g)'s requirement).

Accordingly, the Court denies Plaintiff's summary judgment motion on his FLSA claim and grants Defendants' motion for summary judgment with respect to this issue.

### ii.   NYLL claim

The Court also grants Defendants' summary judgment motion as to Plaintiff's NYLL overtime claim for substantially the same reasons it dismisses Plaintiff's FLSA overtime claim. *See Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 n.5 (2d Cir. 2013) ("[T]he relevant portions of [NYLL] do not diverge from the requirements of the FLSA." (internal quotation marks omitted) (quoting *Whalen v. J.P. Morgan Chase & Co.*, 569 F. Supp. 2d 327, 329 n.2 (W.D.N.Y. 2008)))); *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012) ("Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.'" (quoting *Reiseck v. Universal Commc'ns of Miami, Inc.* 591 F.3d 101, 105 (2d Cir. 2010))); *see also Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 465 n.2 (E.D.N.Y. 2015) ("Overtime claims under the FLSA and NYLL are subject to the same standards."). As explained above, Plaintiff was compensated for overtime work at a rate of one and one-half times his regular pay rate. Accordingly, Plaintiff has failed to establish a violation of the NYLL's overtime provisions.

### g.   FMLA claim

Defendants argue that Plaintiff's FMLA claim should be dismissed because "Plaintiff was provided with all the leave he was due under the FMLA." (Defs.' Mem. 23.) In support, Defendants argue that (1) Plaintiff was not entitled to take FMLA leave more than twelve months after the birth of his child and (2) Plaintiff has not provided any evidence that Defendants or their employees interfered with his FMLA rights. (*Id.* at 22.) Defendants also argue that Plaintiff's FMLA claim "should be deemed abandoned" because he failed to address Defendants'

FMLA arguments in his opposition to Defendants' summary judgment motion.  (Defs.' Reply 10.)

Plaintiff did not respond to Defendants' FMLA arguments in his summary judgment opposition papers.  Therefore, Plaintiff has abandoned his FMLA claim.  *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009) (collecting cases and deeming plaintiff's FLMA interference claim abandoned because "he . . . made no attempt to rebut defendants' motion for summary judgment on this point").  Accordingly, the Court grants Defendants' summary judgment motion with respect to Plaintiff's FMLA claim.

## III.  Conclusion

For the reasons stated above, the Court denies Plaintiff's cross-motion for summary judgment and grants in part and denies in part Defendants' motion for summary judgment.  The Court grants Defendants' motion for summary judgment with respect to Plaintiff's FLSA, NYLL, and FMLA claims.  The Court denies Defendants' motion for summary judgment with respect to Plaintiff's Title VII and NYCHRL discrimination and retaliation claims.

Dated:  September 15, 2023
        Brooklyn, New York

SO ORDERED:


_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge